UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

JUSTIN FITJE,

                    Plaintiff,           **MEMORANDUM & ORDER**

                                          11-CV-1604 (MKB)

        v.

UNITED STATES of AMERICA,

                    Defendant.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Justin Fitje commenced the above-captioned action on April 1, 2011, against

Defendant the United States of America, alleging negligence in violation of the Federal Tort

Claims Act (the "FTCA").  On April 11, 2014, Defendant moved to dismiss the Complaint

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter

jurisdiction or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure.  (Def. Mot. to Dismiss or for Summ. J., Docket Entry No. 38.)  At oral

argument held on March 20, 2015, the Court denied Defendant's motion and "granted Defendant

leave to renew its motion as to the sole issue of whether the government has a duty to maintain

its property under New York [l]aw."  (Mar. 20, 2015 Min. Entry.)  Defendant moves to renew its

motion to dismiss or, in the alternative, for summary judgment.  (Def. Notice of Renewed Mot.

to Dismiss or for Summ. J. ("Def. Mot."), Docket Entry No. 53; Def. Mem. of Law in Supp. of

Def. Mot. ("Def. Mem."), Docket Entry No. 54; Def. Reply Mem. of Law in further Supp. ("Def.

Reply"), Docket Entry No. 57.)  Plaintiff opposes the renewed motion.  (Pl. Aff. in Opp'n to Def.

Mot., Docket Entry No. 56; Pl. Mem. of Law in Opp'n ("Pl. Mem."), Docket Entry No. 56-3.)

For the reasons set forth below, the Court denies Defendant's motion to dismiss and for summary judgment.

## I. Background

Plaintiff seeks damages for injuries he sustained while he was attempting to repair an air conditioning unit ("AC unit") on the roof of a United States Post Office located at 200 Fulton Avenue, Hempstead, New York (the "Post Office"). (Pl. Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 2, Docket Entry. No 45.) Defendant owns and controls the premises on which the Post Office is located (the "Premises"). (*Id.* ¶ 3.)

### a. Maintenance of the Post Office's AC units

At the time of Plaintiff's injury, there were three AC units on the roof of the Post Office. (Def. Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1") ¶ 9, Docket Entry No. 39.) None of Defendant's employees were responsible for the maintenance or repair of the AC units. (*Id.* ¶ 11.) Instead, whenever a problem with the AC units would arise, the Post Office's Postmaster, Kevin Rynne, would report the problem through the United States Postal Service's ("USPS") Facilities Single Source Provider program ("FSSP"), and request servicing and repairs for the AC units. (*Id.* ¶¶ 7, 13.) When a request for service is made through FSSP, USPS Facilities Engineer Gene Giacoia is responsible for hiring an independent contractor to perform any necessary repairs.[1] (*Id.* ¶ 6.) In the past, Defendant has hired independent contractors to perform repairs on the AC units at the Post Office, but has not entered into written agreements with any of these independent contractors. (Dep. of Gene Giacoia 18:9–14, annexed to Decl. of Robert B. Kambic as Ex. C, Docket Entry No. 41.)

---

[1] Giacoia is "in charge of repairs and alterations" for various post offices in the region. (Def. 56.1 ¶ 5.)

On June 8, 2009, Rynne reported through FSSP that one of the AC units on the roof of the Post Office "was not working." (Def. 56.1 ¶ 14.) The "FSSP office" hired a heating, ventilation, and air conditioning ("HVAC") independent contractor, Sound Refrigeration and Air Conditioning, "to fix the problem." (*Id.*) On June 23, 2009, the Post Office reported through FSSP "that the air conditioning at the Post Office was totally down." (*Id.* ¶ 15.) On or about June 24, 2009, Giacoia contacted Apollo HVAC ("Apollo"), another HVAC independent contractor, to "take a look at the [AC] units to assess their repair." (*Id.*) At some point before August 10, 2009, Apollo directed Julio Claudio, Plaintiff's co-worker, "to service problems with the same [AC] unit" that Plaintiff was subsequently sent to service. (*Id.* ¶ 16.) Claudio "changed a couple of contactors on the unit." (*Id.* ¶ 29.)

### b. The August 10, 2009 incident

On August 10, 2009, "Plaintiff received a service ticket from his employer [(Apollo)] to go to the [Post Office] to service an AC unit that was not operating." (*Id.* ¶ 28.) After heading to the roof of the Post Office, a Post Office employee identified the AC unit that was in need of repair,[2] and Plaintiff then retrieved his tools from his vehicle and returned to the roof of the Post Office "unescorted." (*Id.* ¶ 30.)

Plaintiff observed that the AC unit was not operating. (*Id.* ¶ 31.) He removed the main access door to the unit in order to use his electric meter to determine if the unit was receiving power. (*Id.*) When Plaintiff placed his electric meter on the "terminal block"[3] of the middle lug of three lugs on the AC unit, an electric arc and explosion occurred, injuring Plaintiff. (*Id.*;

---

[2] The AC unit at issue has been identified as unit NGCM064338. (Def. 56.1 ¶ 10.)

[3] A "terminal block" is a point where wires can be terminated and one set of wires can transition to another set of wires or multiple wires. (Dep. of Robert E. Salinger ("Salinger Dep.") 25:2–6, annexed to Aff. of Edward D. Tantleff ("Tantleff Aff.") as Ex. E, Docket Entry No. 46.)

Aff. of Brian Keating ("Keating Aff.") ¶ 7, annexed to Tantleff Aff. as Ex. D; Salinger Dep. 56:14–57:2.) Plaintiff was taken to Nassau University Medical Center where doctors performed an "excision of the left dorsal hand burn," a "split thickness skin graft to the left hand," and "serial debridements." (Pl. 56.1 ¶ 23.)

### c. Investigation of the incident

Following Plaintiff's injury, Giacoia hired Robert E. Salinger, a licensed master electrician with SRS Electrical Consultants, Inc., to investigate the cause of the accident. (Letter dated Aug. 13, 2009 ("Salinger Ltr.") 1, annexed to Tantleff Aff. as Ex. F; Salinger Dep. 6:22–7:12, 13:21–14:7.) Salinger examined the damaged AC unit and conducted interviews of individuals who were on-site at the time of the incident.[4] (Salinger Ltr. 1; Salinger Dep. 11:21– 12:3, 13:21–14:7.) In a letter to Giacoia, Salinger memorialized his findings and opinion as to the cause of the incident (the "Salinger Letter"). (Salinger Ltr. 1.) Based on his "experience with similar types of damage," his examination of the AC unit, and the interviews he conducted, Salinger concluded that, although Plaintiff "began the series of events" that resulted in his injury, there were several problems with the AC unit and the associated electrical wiring that "contributed to the size and scale of the injury and damage." (*Id.*)

Salinger concluded that there were three main conditions that led to the incident. First, he determined that because the AC unit's terminal block "was missing a section of the divider between [two] phases of lugs," when Plaintiff placed his electrical meter on the terminal block, it "create[d] a dead shot," resulting in "a cascade of events" that led to Plaintiff's injury. (*Id.*)

Second, Salinger determined that the main fuses in the basement which were "feeding" the AC unit were also problematic. He found that the "single blow type fuses," which had an

---

[4] Salinger did not interview Plaintiff. (Salinger Ltr. 1.)

ampacity of 400 amps, were connected to the "service switch" outside the AC unit by a wire that had an ampacity of 225 amps, which "may have helped the [electric] arc to become higher." (*Id.*) Salinger stated that instead of the 400 amp "single blow types fuses" that were used in the basement, Defendant should have used "200 amp dual element fuse[s]" because dual element fuses "would have probably reacted faster, possibly reducing some of the [electric] arc." (Salinger Dep. 39:20–41:18.)

Third, Salinger determined that the wiring for the terminal block was inaccurate. (Salinger Ltr. 1.) Salinger stated that the maximum wiring that was listed on the AC unit for the terminal block was "2/0 wire," which was too small to serve the unit. (*Id.*) He also determined that the size of the actual wiring from the service switch to the AC unit was "3/0 wire," which was the correct size for the unit. (*Id.*) However, to make the "3/0 wire" fit into the terminal block, which had a listed wire size of "2/0," the "ends of the wire were clipped." (*Id.*) Salinger stated that clipping the larger size wires to fit the terminal block was an improper procedure and "illegal." (*Id.*) Salinger also stated that the clipping of the wire appeared to have been performed when the unit was first installed as "all components appear[ed] to be original to the unit." (*Id.*)

Plaintiff retained Brian Keating, the director of apprenticeship and training for the United Service Workers Union Local 355 and Apollo's former director of operations, to determine the cause of the incident. (Keating Aff. ¶ 4.) Keating accompanied Salinger when Salinger inspected the AC unit. (*Id.* ¶ 6.) In addition to Keating's visual inspection of the AC unit and the associated wiring, he reviewed the deposition transcripts of Plaintiff, Rynne and Salinger, as well as the USPS repair records and the Salinger Letter. (*Id.*) Keating determined that there were many issues with the AC unit and the associated wiring. First, he determined that that the

terminal block was "improperly wired with 3/0 wire," contrary to the manufacturer's specification for "2/0 wire," and that, "[i]n order to fit the 3/0 wire, the wires were snipped down until they would fit into a 2/0 slot in the [t]erminal [b]lock." (*Id.*) Second, he determined that there were "improper oversized slow blow fuses" in the basement. (*Id.*) He found that the "improper wiring affected the integrity of the [t]erminal [b]lock and created a dangerous condition." (*Id.*) He also found that the failure to both "properly wire" and "maintain" the terminal block "in accordance with the National Electrical Code" led to a "breakdown of the divider between the phase lugs and was also a dangerous condition." (*Id.*) Keating concluded that "the aforementioned defects in the [t]erminal [b]lock and the oversized fuses[] were [] substantial factor[s] in causing" the incident and Plaintiff's injuries. (*Id.* ¶ 9.)

## II. Discussion

### a. Standards of review

#### i. Rule 12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). The plaintiff has the burden to prove that subject matter jurisdiction exists, and in evaluating whether the plaintiff has met that burden, "'[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547

F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010).  A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists.  *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010).

### ii.    Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id*.  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.    Discussion

As Defendant concedes, under the FTCA, "the liability of the United States to a plaintiff for negligence is determined 'in accordance with the law of the place where the act or omission occurred.'"  (Def. Mem. 3 (quoting 28 U.S.C. § 1346(b)));  *see also* 28 U.S.C. § 2674; *Vidro v.*

*United States*, 720 F.3d 148, 150 (2d Cir. 2013). The parties do not dispute that New York law governs Plaintiff's negligence claims. (Def. Mem. 3; Pl. Mem. 5.)

To prevail on a claim for negligence under New York law, a plaintiff must establish: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir.) (quoting *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)), *as amended* (Nov. 23, 2015); *see also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 576 (2011) ("To establish a cause of action sounding in negligence, a plaintiff must establish the existence of a duty on defendant's part to plaintiff, breach of the duty and damages." (citing *Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 333 (1981))). Whether a duty is owed is a question of law that the court must resolve. *Pasternack*, 807 F.3d at 19 ("[T]he definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." (alteration in original) (quoting *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994))).

Defendant argues that, under New York law, its duty to maintain the premises in a reasonably safe condition is limited to only the common areas of the Post Office. (Def. Mem. 3.) Defendant contends that, because the roof where the AC unit was located is not a common area, it has no duty to maintain the roof in a reasonably safe condition.[5] (*Id.* at 3–4.) Defendant also

---

[5] Defendant states that:

> Under New York law, landlords or owners of a property, commercial or residential, have an obligation to maintain the *common areas* in a reasonably safe condition and have a duty to use reasonable care to inspect and repair *common areas*. Here, the [AC] unit was not in [the Post Office] common area . . . . The unit itself

argues that, even if it does have a duty to maintain the entire Premises in a reasonably safe condition, rather than just the common areas, it did not owe a duty to Plaintiff because Plaintiff was injured by the dangerous condition that he was hired to repair.  (*Id.* at 5.)  Plaintiff argues that "a landowner has a duty to maintain his entire premises in a reasonably safe condition and the location of the condition [that caused the injury] is a factor for the jury to consider [in determining] whether the defendant's conduct was reasonable under the circumstance."  (Pl. Mem. 7 (citing *Basso v. Miller*, 40 N.Y.2d 233, 241 (1976)).)  Plaintiff also argues that, because he was hired to repair a specific AC unit and "was injured before he could inspect and repair the unit," he was not injured by the dangerous condition he was hired to repair.  (Pl. Mem. 6, 10.)

### i.     Landowner's duty of care

"An owner of property has a duty to maintain his or her premises in a reasonably safe condition."  *Walsh v. Super Value, Inc.*, 904 N.Y.S.2d 121, 125 (App. Div. 2010) (first citing *Kellman v. 45 Tiemann Assoc., Inc.*, 87 N.Y.2d 871, 872 (1995); and then citing *Basso*, 40 N.Y.2d at 241)).  "The scope of such duty is determined 'in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.'"  *Taylor v. Lands End Realty Corp.*, 941 N.Y.S.2d 293, 295 (App. Div. 2012) (quoting *Basso*, 40 N.Y.2d at 241); *see also Peralta v. Henriquez*, 100 N.Y.2d 139, 144 (2003) ("'[A] landowner must act as a reasonable person in maintaining his or her property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to

---

was on the roof of the building, and postal employees, and the public, had no reason or occasion to access the roof.
(Def. Mem. 3–4 (internal quotation marks omitted) (first citing *Torres v. United States*, No. 09-CV-5092, 2010 WL 5422547, at *3 (S.D.N.Y. Dec. 23, 2010); then citing *Williams v. Matrix Fin. Servs. Corp.*, 158 F. App'x 301, 303 (2d Cir. 2005); and then citing *Wynn ex rel. Wynn v. T.R.I.P. Redevelopment Assocs.*, 745 N.Y.S.2d 97, 102 (App. Div. 2002)).)

others, the seriousness of the injury, and the burden of avoiding the risk.' . . . The use to which one's property is put, and the frequency of that use by others, weigh heavily in determining the likelihood of injury, the seriousness of the injury and the burden of avoiding the risk.") (alterations omitted) (quoting *Basso*, 40 N.Y.2d at 241)). This duty exists regardless of whether the premises are open to the public. *Peralta*, 100 N.Y.2d at 144 ("Landowners have a duty to maintain their property in a reasonably safe condition whether the property is open to the public or not.").

Generally, "liability for a dangerous condition on property may only be predicated upon occupancy, ownership, control or special use of such premises." *Branch v. Cty. of Sullivan*, 25 N.Y.3d 1079, 1082 (2015) (quoting *Jackson v. Bd. of Educ. of City of N.Y.*, 812 N.Y.S.2d 91, 94 (App. Div. 2006)); *see also Diaz v. Am. Airlines, Inc.*, No. 13-CV-7813, 2015 WL 4503649, at *5 (S.D.N.Y. July 23, 2015) ("As a general rule, liability for a dangerous or defective condition on real property must be predicated upon ownership, occupancy, control, or special use of that property." (quoting *Suero-Sosa v. Cardona*, 977 N.Y.S.2d 61, 63 (App. Div. 2013))); *Alnashmi v. Certified Analytical Grp., Inc.*, 929 N.Y.S.2d 620, 625 (2011) ("[T]he [New York] Court of Appeals has stated in numerous cases that 'control is the test which measures generally the responsibility in tort of the owner of real property.'" (collecting cases)). "The existence of one or more of these elements is sufficient to give rise to a duty to exercise reasonable care." *Diaz*, 2015 WL 4503649, at *5 (quoting *Quick v. G.G.'s Pizza & Pasta, Inc.*, 861 N.Y.S.2d 762, 763 (App. Div. 2008)). "Where none of these factors are present, a party cannot be held liable for injuries caused by the allegedly defective condition." *Reynolds v. Avon Grove Props.*, 12 N.Y.S.3d 199, 200–01 (App. Div. 2015) (quoting *Gover v. Mastic Beach Prop. Owners Ass'n*, 869 N.Y.S.2d 593, 594 (App. Div. 2008)); *see also Chernoguz v. Mirrer Yeshiva Cent. Inst.*, 994

N.Y.S.2d 362, 363 (App. Div. 2014) (same).

Landlords generally are not liable for injuries resulting from a dangerous or defective condition on leased property, where the landlord has transferred possession, occupancy and control of the leased property. *See Chapman v. Silber*, 97 N.Y.2d 9, 19 (2001) ("Historically, landlords could not be held liable for injuries caused by dangerous conditions on their premises when possession had been transferred." (citing *Campbell v. Elsie S. Holding Co.*, 251 N.Y. 446, 448–49 (1929))); *Alnashmi*, 929 N.Y.S.2d at 624 (noting that a landlord has "minimal duties to the tenant and others on the premises" because "[b]y transferring possession and control of the property to a tenant, the landowner also transfer[s] the responsibility for dangerous conditions, at least [as to] those arising after the transfer, to the tenant" (collecting cases)); *see also Rivera v. Nelson Realty, LLC*, 7 N.Y.3d 530, 534 (2006) ("At common law, liability in tort with respect to land and buildings generally depended on occupation and control; as a result, it was the tenant, not the landlord, who was generally held responsible for injuries caused by the condition or use of leased premises." (quoting *Ramos by DeLeon v. 600 W. 183rd St.*, 547 N.Y.S.2d 633, 635 (App. Div. 1989))).

This "common-law rule, however, rests on the premise that, by transferring possession of the premises to the lessee, the landowner has also surrendered 'control' over them." *Alnashmi*, 929 N.Y.S.2d at 625; *see also Chapman*, 97 N.Y.2d at 19 (noting that, historically, "[c]ourts opined that conveyance of possession by lease was similar in effect to conveyance of title" (collecting cases)). Because this rule requires a transfer of possession and control, where a landlord retains control of a property's common areas, the landlord also retains the duty to maintain those common areas in a reasonably safe condition. *See Wynn*, 745 N.Y.S.2d 97, 100 ("Under long-standing common law, a landlord has a duty to use ordinary care to keep those

areas which are reserved and intended for the common use of the tenants and owner of the building *and subject to the landlord's control*, i.e., the common areas, 'in a reasonably safe and suitable condition.'" (emphasis added) (quoting *Walsh v. Frey*, 101 N.Y.S. 774, 775 (App. Div. 1906); and collecting cases)).

It is undisputed that Defendant owns and controls the Premises. (Pl. 56.1 ¶ 3; *see also* Answer ¶ 7 (admitting that USPS is the owner of the premises), Docket Entry No. 6.) Moreover, Defendant has not asserted that it has transferred ownership, occupancy or control of the Premises to any person or entity. Thus, as the owner and occupant of the Premises, Defendant has a duty to maintain the Premises in a reasonably safe condition. *See Gronski v. Cty. of Monroe*, 18 N.Y.3d 374, 379 (2011) (stating that a landowner who has "possession and control" of property owes a duty of care to maintain the property in a reasonably safe condition).

Relying on cases that address a landlord's duty to maintain the common areas of its property where the landlord has transferred possession, occupancy or control to a tenant, Defendant argues that it had no duty to maintain any portion of the Premises other than the common areas, which it contends does not include the roof where the AC unit was located. (Def. Mem. 3–4 (first citing *Torres*, 2010 WL 5422547, at *3; then citing *Williams*, 158 F. App'x at 303; and then citing *Wynn*, 745 N.Y.S.2d at 102).). These cases are inapposite and do not support Defendant's argument. In *Wynn*, the plaintiffs sued their landlord for damages based on injuries caused by ingesting lead-based paint that was located in the common areas of the apartment building. *Wynn*, 745 N.Y.S.2d at 98–99. The court held that the landlord-defendant owed the tenant-plaintiffs a duty of care to maintain the common areas of the apartment building, where the lead-based paint was located. *Id.* at 100–02. The court noted that the landlord "had no duty to maintain in good repair leased premises for which [it] had transferred possession," but

"under long-standing common law," the landlord-defendant had a duty "to make repairs and maintain the common areas in a reasonably safe condition." *Id.* (emphasis omitted). Similarly in *Williams*, where the plaintiff slipped and fell and sustained injuries in the stairway of an apartment building, the court held that the building owner-defendant owed the tenant-plaintiff a duty of care to maintain the common areas of the building, including the stairway. *Williams*, 158 F. App'x at 302–03. The court in *Williams* noted that "New York common law obligates a landlord or owner 'to use reasonable care to inspect and repair common areas.'" *Id.* at 303 (quoting *Wynn*, 745 N.Y.S.2d at 102). In *Torres*, the plaintiff sustained injuries when he slipped and fell on the stairway of a post office building. *Torres*, 2010 WL 5422547, at *1. The court held that the United States defendant owed the plaintiff a duty of care to maintain the common areas of the post office, including the stairway. *Id.* at *3–4. The court noted that, "[u]nder New York common law, landlords or owners of a property, commercial or residential, have an obligation to maintain the common areas in a reasonably safe condition and have a duty to use reasonable care to inspect and repair common areas," a point that the defendant did not contest. *Id.* at *3 (first citing *Williams*, 158 F. App'x at 303; and then citing *Wynn*, 745 N.Y.S.2d at 101–02).

While *Wynn*, *Williams* and *Torres* all discuss a landlord's duty to maintain the common areas of its premises in a reasonably safe condition, none suggest, as Defendant argues, that a landowner's duty to maintain its premises is limited to *only* the common areas of the premises. As the court explained in *Wynn*, a landlord is relieved of its duty to maintain its premises in a reasonably safe condition only with respect to "premises for which [it has] transferred possession." *Wynn*, 745 N.Y.S.2d at 179; *see also Alnashmi*, 929 N.Y.S.2d at 625. Here, because Defendant controls the Premises as the owner and occupant, its duty to maintain the

Premises in a reasonably safe condition applies to the entire Premises within its control.[6]

## ii. Scope of the work Plaintiff was hired to perform

A "[land]owner has a nondelegable duty to provide the public with a reasonably safe premises." *Scott v. Redl*, 842 N.Y.S.2d 485, 487 (App. Div. 2007) (alteration in original) (quoting *Backiel v. Citibank, N.A.*, 751 N.Y.S.2d 492, 494 (App. Div. 2002)). "This includes the duty to provide 'its employees and the employees of independent contractors with a safe place to work.'" *Id.* (quoting *Backiel*, 751 N.Y.S.2d at 496). However, a landowner does not owe a duty to a person injured by the dangerous condition the person is hired to repair. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 426 (S.D.N.Y. 2014) ("*In re Disaster Site Litig.*") (An "exception" to "the duty to provide a reasonably safe workplace" exists "where the particular defect giving rise to a plaintiff's injury was the very defect the injured plaintiff was hired to remediate." (citing *Kowalsky v. Conreco Co.*, 264 N.Y. 125, 128 (1934))); *Hansen v. Trustees of Methodist Episcopal Church of Glen Cove*, 858 N.Y.S.2d 303, 304 (App. Div. 2008) ("Employers have a common-law duty to provide their employees with a safe place to work. The duty, however, does not extend to . . . defects the employee is hired to repair." (collecting cases)); *Contrera v. Gesher Realty Corp.*, 766 N.Y.S.2d 200, 201 (App. Div. 2003) ("[A]n owner of real property has no responsibility to one hurt through a dangerous condition he has undertaken to fix." (citing *Carrion v. Lewmara Realty Corp.*, 635 N.Y.S.2d 4, 5 (1995))).

In order to relieve the landowner of its duty of care, the dangerous condition must be within the scope of the work the employee or contractor was hired to perform. *See In re Disaster*

---

[6] Because the Court finds that Defendant has a duty to maintain the Premises in a reasonably safe condition, the Court does not address Defendant's argument that the roof of the Premises is not a "common area" and that it therefore has no duty to maintain the roof of the Premises.

*Site Litig.*, 44 F. Supp. 3d at 426 ("[I]if an employee is injured by some defective condition he was not *specifically* hired to remediate, the exception will not apply." (first citing *Colello v. T.J. Stevenson & Co., Inc.*, 132 N.Y.S.2d 207, 210 (App. Div. 1954); and then citing *Patalano v. Am. President Lines, Inc.*, 322 F. Supp. 2d 293, 295–97 (E.D.N.Y. 2004))); *Scott*, 842 N.Y.S.2d at 487 ("While an owner may not be held liable for an injury to an employee of an independent contractor caused by a condition which the employee was called upon to remedy, the employee does not assume the risk of injury from other defects or dangerous conditions in the premises which are outside the scope of that employee's work." (quoting *Backiel*, 751 N.Y.S.2d at 496 (collecting cases))).  Whether a dangerous condition is within the scope of the work an employee or contractor is hired to perform is a fact specific inquiry.  *See Scott*, 842 N.Y.S.2d at 487 (holding that "the plaintiff raised a question of fact" regarding the scope of the work she was hired to perform "and, thus, whether she was injured by the same dangerous condition she was called upon to remedy").

Where it can be readily determined that the cause of the plaintiff's injury was within the scope of the work the plaintiff was hired to perform, courts have found at summary judgment that the landowner is not liable for the plaintiff's injury.  *See Annicaro v. Corp. Suites, Inc.*, 949 N.Y.S.2d 717, 718 (App. Div. 2012) (finding no liability where the construction worker-plaintiff was injured when he slipped on a piece of metal and fell down a staircase because his job was to "remove debris from an unfinished interior staircase," and his "injuries were caused by debris in that area"); *Henriquez v. New 520 GSH LLC*, 931 N.Y.S.2d 312, 313 (App. Div. 2011) (finding no liability where the plaintiff, an elevator maintenance mechanic whose duties included "complete maintenance service," was "injured when the elevator car in which he was riding rapidly descended to the bottom of the elevator shaft"); *Hansen*, 858 N.Y.S.2d at 304 (finding no

liability where the plaintiff was hired "to repair portions of the roof" by replacing "the gutters and a rotted soffit," and was injured when a rotted portion of the roof fell on him as he was removing the gutters); *Bedneau v. N.Y. Hosp. Med. Ctr. of Queens*, 841 N.Y.S.2d 689, 690 (App. Div. 2007) (finding no liability where the plaintiff was hired to repair a leaking boiler and was injured when he "slipped and fell on water that had accumulated on the floor" of the boiler room as a result of the leak and the additional water that was released during the plaintiff's repair); *Waiters v. N. Trust Co. of N.Y.*, 816 N.Y.S.2d 18, 20–22 (App. Div. 2006) (finding no liability where the maintenance worker-plaintiff "was injured when he slipped and fell on a wet bathroom floor" as "plaintiff's job duties required him to clean up water on the floor"); *Contrera*, 766 N.Y.S.2d at 200 (finding no liability where the welder-plaintiff was hired to replace a wooden staircase "with one made of iron," and was injured when "the rotted step" of the staircase fell apart, "causing him to fall through").

However, where it cannot be readily determined that the cause of the plaintiff's injury was within the scope of work the plaintiff was hired to perform, courts have denied summary judgment motions and allowed the cases to proceed to trial. *See In re Disaster Site Litig.*, 44 F. Supp. 3d at 427 (denying summary judgment to the defendant where the plaintiff, a "licensed asbestos worker," was hired to remediate asbestos and remove general debris and was injured from inhaling "'alkaline-based' dust," because the risk "posed by 'high-alkaline' dust . . . was not within the scope of "the *specific* work [the plaintiff] was hired to perform"); *Backiel*, 751 N.Y.S.2d at 494 (affirming the denial of the defendant's summary judgment motion where the office cleaner-plaintiff was injured when she slipped and fell on a wet lobby floor but was responsible for "the cleaning of offices on the upper floors and not maintenance of the lobby entrance and plaza"); *Wray v. 654 Madison Ave. Assocs., L.P.*, 677 N.Y.S.2d 129, 130

(App. Div. 1998) (affirming in relevant part the denial of the defendant's summary judgment motion where the plaintiff, an elevator maintenance worker, was injured while repairing an elevator but the plaintiff's injuries were not caused "by the noise and vibration in the compensating elevator sheave that plaintiff was called upon to remedy, but by the absence of a pit shut-off switch"); *Rosciano v. Royal Farms, Inc.*, 654 N.Y.S.2d 39, 39 (App. Div. 1997) (affirming denial of summary judgment where the plaintiff was "injured when he cut his hand on sharp cracked [bathroom] tiles" because the plaintiff "was hired to install a [bathroom] fixture" not repair the tiles); *Strauss v. Original Consumers Oil Heating Corp.*, 802 N.Y.S.2d 295, 296–97 (App. Term 2005) (per curiam) (affirming judgment after trial in the plaintiff's favor where the building superintendent plaintiff was injured when he slipped and fell while in the process of cleaning an oil puddle because "the accident was caused not only by the presence of the oil puddle that plaintiff was assigned to 'sweep up,' but also by" the defendant's "dubious stopgap measure").

Here, Plaintiff was hired to repair a specific non-working AC unit on the roof of the Post Office. (Def. 56.1 ¶¶ 10, 28–30.) Unlike the plaintiff in *Henriquez* who was responsible for "providing complete maintenance service in every respect," Plaintiff was not hired to provide general maintenance to the AC unit. *See Henriquez*, 931 N.Y.S.2d at 313. In attempting to identify and repair the problem with the AC unit, Plaintiff was injured. Because the Court cannot conclude from the evidence before the Court that the cause of Plaintiff's injury was within the scope of the work Plaintiff was hired to perform, the Court denies Defendant's summary judgment motion.

The evidence before the Court suggests that there were three contributing factors that caused the incident that resulted in Plaintiff's injury: (1) a missing divider section in the AC unit

that enabled Plaintiff's electric meter to create a dead shot; (2) wires that were allegedly improperly clipped to fit into the terminal block that appeared to require a different size of wires; and (3) oversized fuses in the Post Office's basement, which "may" have helped increase the size of the electric arc that injured Plaintiff.  (Salinger Ltr. 1; Keating Aff. ¶ 9; *see also* Salinger Dep. 39:20–42:3, 44:21–45:5.)  Based on the evidence before the Court, a reasonable jury could find that these dangerous conditions were not within the specific scope of work that Plaintiff was hired to perform.  *See In re Disaster Site Litig.*, 44 F. Supp. 3d at 427; *Backiel*, 751 N.Y.S.2d at 494; *Rosciano*, 654 N.Y.S.2d at 39.  Like the plaintiff in *Wray* who was hired to repair an elevator's pulley but was injured by the elevator's lack of a safety switch, *Wray*, 677 N.Y.S.2d at 130, Plaintiff was hired to repair a non-working AC unit and the evidence supports an inference that he was injured, at least in part, by dangerous conditions external to that unit. Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's injuries were caused by a dangerous condition outside the scope of the work Plaintiff was hired to perform.

Accordingly, because Defendant has a duty to maintain the entire Premises in a reasonably safe condition and, construing the evidence in Plaintiff's favor, a reasonable jury could find that Plaintiff's injury was caused by a dangerous condition outside the scope of the work he was hired to perform, the Court denies Defendant's motion.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion to dismiss and its

alternative summary judgment motion.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2016
      Brooklyn, New York